GABRIEL ZISER, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF WILLIAM ZISER, DECEASED, PLAINTIFF, v. COLONIAL WESTERN AIRWAYS, INCORPORATED, DEFENDANT.

LAURA T. STEEVER, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF WILLIAM C. STEEVER, DECEASED, PLAINTIFF, v. COLONIAL WESTERN AIRWAYS, INCORPORATED, DEFENDANT.

GERTRUDE M. STEEVER, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF GERTRUDE M. STEEVER, DECEASED, PLAINTIFF, v. COLONIAL WESTERN AIRWAYS, INCORPORATED, DEFENDANT.

MAX NEWBERGER, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF RAYMOND HELMSTETTER, DECEASED, PLAINTIFF, v. COLONIAL WESTERN AIRWAYS, INCORPORATED, DEFENDANT.

ANDREW HAGYMASI, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF STEPHEN HAGYMASI, DECEASED, PLAINTIFF, v. COLONIAL WESTERN AIRWAYS, INCORPORATED, DEFENDANT.

ANDREW HAGYMASI, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF FRANK HAGYMASI, DECEASED, PLAINTIFF, v. COLONIAL WESTERN AIRWAYS, INCORPORATED, DEFENDANT.

Argued October 6, 1931—Decided October 10, 1932.

Before GUMMERE, CHIEF JUSTICE, and Justices PARKER and CASE.

For the plaintiffs, *Biro & Strell, Ernest P. Biro* and *Harry Unger.*

For the defendant, *James D. Carpenter, Jr.* (*William D. Reed,* of the New York bar).

PER CURIAM.

These cases arise out of an airplane crash at the Newark airport on Sunday, March 17th, 1929. As a result of the accident thirteen passengers were killed. In the suits before us, there were verdicts for the respective plaintiffs, and the trial judge allowed rules to show cause why new trials should not be had. No exceptions were reserved, and the rules therefore involve questions of law as well as of fact.

The cases were tried together, the trial lasted a week or more, and the printed case consists of three volumes, in all some eighteen hundred pages, and there are nearly two hundred and sixty pages of printed briefs. The task of examining all this, subject to the interruptions of other business, was necessarily protracted.

The actions were based of course on claims of negligence partly of the defendant company itself in employing an incompetent and inexperienced pilot, partly of its servants, the ground force, and partly of the pilot himself. Apart from the numerous minor points involving rulings on evidence, instructions to the jury, and refusals of requests to charge, the three fundamental propositions urged are that there was error in refusing to nonsuit, error in refusing to direct a verdict for defendant and that the verdict was against the weight of evidence. One of the verdicts is also challenged as excessive.

On the date in question, the plane involved was devoted to taking up sight-seeing passengers for a flight of a few minutes to and over New York City and return. The accident occurred about five P. M., after six or more trips which had ended

safely. The plane was a three-motored Ford plane, licensed to carry twelve passengers and no more. On the fatal trip there were thirteen passengers, the pilot, and an associate, who apparently was not classed as a passenger. The licensed weight limit was probably not exceeded, but otherwise as to the limit of number. It was a windy, gusty day, as the jury were clearly entitled to find, the wind blowing from the northwest at from twenty-five to forty miles an hour. The terrain of the airport and its vicinity was at that time not above reproach, and indeed the airport seems to have been in some respects incomplete. It was situate on a partially reclaimed swamp. To the northwest was the city of Newark; and adjoining the airport on the west was the new state highway on an elevated viaduct. To the north were the extensive city dumps, composed of ashes and other waste matter unloaded into the swamp, and the combustible components of this waste had been fired and were burning. North of these, a railroad yard and tracks ran from east to west. To the east there was another railroad with a number of standing cars. On the south was a considerable area of swamp or reclaimed swamp, affording a clear space for emergency or other landing, though the ground was soft.

Two runways were provided for the use of airplanes in "taking off." One ran from northeast to southwest; the other, called the northwest runway, crossed the first and ran from northwest to southeast. The latter was used by the plane in question, which made its start toward the northwest, practically in the wind's eye.

There was evidence of a ground rule to the effect that planes whose route required a turn after taking off should make that turn to the left. The importance of obeying that rule under the circumstances of this case, is clear: for in case of a forced landing a left turn would bring the plane over the comparatively harmless swamp, while a right turn would carry it over railroad yards and tracks and the burning dumps, as actually happened. It is said that the pilot was ignorant of this rule. If so, the jury were entitled to consider that he should have informed himself of it, or that other

agents of defendant should have informed him of it. In either event, a charge of negligence in this regard comes back to the defendant.

The pilot, Lou Foote, was new to the locality, and as the evidence indicates, was new to flying this class of plane with passengers. He first saw the airport at one P. M. that day. He sat in the plane for three trips over New York with a man named Weatherton operating the plane: then it was turned over to him, and he made three trips in safety and crashed on the fourth.

The accident occurred in this way: Taking off to the northwest into the wind, the plane gained altitude too slowly; presently it was seen that the left engine was in trouble; then perhaps the middle one. Foote attempted a right turn and succeeded in heading eastward, but his plane was losing altitude and he had to land. Avoiding the burning dumps he attempted to ride over the railroad to the east, failed, and crashed into a car loaded with sand.

Laying aside without discussion such claims as that the sparkplugs were improperly adjusted, that the plane had not had the necessary inspection and checking up, we think the jury were clearly entitled to take the case on the theory that there was negligence in entrusting the plane to a pilot new to the locality and unfamiliar with the terrain; in failing to observe the ground rule about turning to the left, or in failing to ascertain that such rule existed; in selecting the less safe turn to the right, perhaps as a matter of convenience; in taking out a heavily loaded plane on a day distinctly unfavorable to flying; and in loading the plane beyond the numerical limit set by the rules. The fact that Foote had managed to come safely through the three previous trips is of no particular significance. *Temperance Hall Association* v. *Giles,* 33 *N. J. L.* 260.

As to the degree of care required, the trial court certainly did not err unfavorably to defendant in leaving the question of common carrier *vel non* to the jury. The regulations on taking of passengers cited by counsel as removing defendant from the common carrier class seem to us to be merely proper

rules for such a carrier to make and enforce, as *e. g.,* no drunken or noisy person to be taken, no overloading, no flight if weather bad. A set schedule is no essential of common carrying; nor is such a carrier required, when there is no set schedule, to operate with a half a load. The practice, which the brief asserts was followed in some cases, of filling the plane to part capacity and then requiring the intending passengers to leave it and make room for a party of later arrivals which would fill the plane, might well subject the defendant to actions for damages unless stipulated in advance, but of itself would not countervail the other conditions marking defendant as a common carrier. We think the judge might properly have charged that defendant was a common carrier.

Seventy reasons for new trial were filed. We have not stopped to count those that are relied on in the argument and the briefs, and time fails to deal with them *seriatim.* Suffice it to say, that after a most careful examination of all rulings and instructions presented, we find none that constitute error harmful to the defendant. In particular, there was no error in refusing to nonsuit, or to direct a verdict, and on the question of liability, we are entirely clear that the verdict was not against the weight of evidence.

The verdict in the William C. Steever case is attacked as excessive. We think that it is excessive. The evidence as to the amount provided by him for the support of his family, taken in connection with his own age and that of his wife, and other circumstances, is altogether insufficient to justify a verdict of $46,000 in a death case. In that class of cases the court can and does exercise a closer supervision over the amount of a verdict than in cases where there is a living plaintiff. We think a verdict of $25,000 is enough. If the plaintiff in that case will consent to a verdict of that amount, the rule to show cause will be discharged, otherwise it will be made absolute on damages only. The rules in the other cases will be discharged.